## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| CRYSTAL LAGOONS U.S. CORP. and CRYSTAL LAGOONS TECHNOLOGIES, INC. | |
| Plaintiffs, | Case No.: 1:23-cv-23257 |
| vs. | |
| MARTIN AQUATIC DESIGN & ENGINEERING, LLC, AQUATIC DESIGN & ENGINEERING, INC., BLUE MAR BASINS, LLC, PETER LICAVOLI, VENUWORKS, INC., VENUBLUE, LLC, CLEARTIDE MANAGEMENT GROUP, LLC, XPRNTL, LLC, and JOHN HUGHES | **JURY TRIAL DEMANDED** |
| Defendants. | |

## PLAINTIFFS' COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Crystal Lagoons U.S. Corp. and Crystal Lagoons Technologies, Inc. (together, "***Crystal Lagoons***") file this Complaint against Defendants Martin Aquatic Design & Engineering, LLC ("***Martin Aquatic***") and its affiliated companies, Aquatic Design & Engineering, Inc. ("***Aquatic Design***") and Blue Mar Basins, LLC ("***BMB***"); Peter Licavoli ("***Licavoli***"); VenuWorks, Inc. ("***VenuWorks***"); VenuBlue, LLC ("***VenuBlue***"); Cleartide Management Group, LLC ("***Cleartide***"), XPRNTL, LLC ("***XPRNTL***"); and John Hughes ("***Hughes***") (collectively, "***Defendants***").

1

## I.   INTRODUCTION

1.     Crystal Lagoons is a technology company that owns a large intellectual property portfolio related to artificial water lagoons.  This intellectual property portfolio—consisting of patents, trade secrets, trademarks, trade dress, designs, and confidential information—forms the core of Crystal Lagoons' innovative, one-of-a-kind lagoon technology.   The technology enables the construction and maintenance of large, artificial water lagoons that would otherwise be economically impractical if built according to traditional swimming pool construction methods.[1]  Crystal Lagoons was the first to introduce the water lagoon concept to the worldwide market; its underlying lagoon technology gives Crystal Lagoons a crucial edge over its competitors.

2.     Crystal Lagoons is responsible for more than 80 projects in operation or construction in the United States (including Florida and Texas) and around the world, and has more than 1,000 other projects that are signed or in negotiation. In recent years, Crystal Lagoons has expanded its business line to Public Access Lagoons projects ("*PAL*™ *Projects*") that bring beach life to urban environments.   The PAL™ model generates multiple revenue streams from entrance tickets, water sports, restaurants, retail, concerts, trade shows, weddings, day clubs, and other events associated with or surrounding the lagoon.

---

[1] For example, one lagoon in Chile (a 20-acre lagoon) is equivalent to 6,000 residential swimming pools, which (if built according to traditional methods) would require intricate piping systems, more than 2,000 inlets, roughly 6,000 doses of chlorine, and 6,000 filters for operation.

The PAL™ model has proven successful, with 288 projects having been signed as part of master agreements.

3.     Hughes, then an executive of VenuWorks and VenuBlue, collaborated with Crystal Lagoons to commercialize the PAL™ model.  In 2018, Crystal Lagoons and VenuWorks executed a Non-Disclosure Agreement ("**_NDA_**") and Teaming Agreement whereby VenuWorks (through its affiliate/subsidiary, VenuBlue) would collaborate with Crystal Lagoons to grow, promote, and manage the PAL™ model in certain market segments.[2]  For nearly three years, Hughes worked closely with Crystal Lagoons (including its regional director, Licavoli) to promote the PAL™ model; and during this time, Hughes acquired certain trade secret information from Crystal Lagoons.  Indeed, Hughes (in his capacity as an executive of VenuWorks and VenuBlue) attended dozens of meetings with Crystal Lagoons and its current and prospective customers—where he gained intimate knowledge of Crystal Lagoons' trade secrets like supplier information, vendor information, customer information, and client strategic information.  Hughes, VenuWorks, and VenuBlue were contractually obligated to maintain the secrecy of this information under the NDA.

4.     Unknown to Crystal Lagoons, Hughes maintained a close relationship with the founder of Martin Aquatic.  For over thirty-five years, Martin Aquatic has built and operated water facilities using traditional swimming pool

---

[2] VenuBlue held sales and management rights of PAL™ Projects built or developed on public land owned by federal, state, or municipal governments within the United States.

technology,[3] and sought to penetrate the highly profitable water lagoon market. To do so, Martin Aquatic needed people with experience in this niche field to help close customer deals and bring the technology to market.  Hughes and Licavoli were those people.

5.     In April 2021, Martin Aquatic formed BMB to expand its business line to artificial water lagoons.  By then, Hughes had left VenuBlue to serve as President of Cleartide (a position Hughes held until November 2021, when he left to form XPRNTL).  Martin Aquatic knew that Hughes had worked with Crystal Lagoons on the PAL™ model, and  thus strategically engaged Cleartide and/or XPRNTL so that Hughes could help launch BMB.  In connection with this collaboration, Hughes, Cleartide, and/or XPRNTL disclosed Crystal Lagoons' trade secret information to Martin Aquatic and BMB.

6.     In addition, on information and belief, Hughes introduced Martin Aquatics to Licavoli, the former Regional Director (East U.S.) for Crystal Lagoons, with whom Hughes had worked with on the PAL™ model.  Licavoli, who left Crystal Lagoons in July 2020, had acquired (subject to a confidentiality provision in his employment agreement) Crystal Lagoons' trade secret information, including confidential information about its products, customers, and market information.  Given his prior position at Crystal Lagoons, Martin Aquatic and

---

[3] Traditional swimming pool technology is significantly different than the technology needed to design, build, and operate large artificial water lagoons.

BMB knew Licavoli had Crystal Lagoons' valuable trade secret information, and intended to exploit that information to penetrate the lagoon market.

7.      Martin Aquatic and BMB thus solicited Licavoli to join their ranks. Licavoli joined Martin Aquatic in February 2022 (less than 10 months after BMB's formation) as Martin Aquatic's national business development director.   On information and belief, Licavoli took Crystal Lagoons' sensitive trade secret information with him to Martin Aquatic to help launch and promote BMB. Crystal Lagoons believes that this information enabled Martin Aquatic to accelerate the development and commercialization of its lagoon product and helped close deals with customers.  In June 2022, Martin Aquatic formally launched BMB as a new business line to develop and operate multi-acre, artificial swimming facilities.

8.      In sum, with the help of Hughes and Licavoli, Martin Aquatic and BMB have (i) acquired and (ii) used trade secret information misappropriated from Crystal Lagoons to avoid the immense time and expense necessary to independently develop and market its own lagoon technology.

9.      Crystal Lagoons therefore brings this action for trade secret misappropriation under the Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. § 1836(b), and the Florida Uniform Trade Secrets Act ("**FUTSA**"), Fla. Stat. § 688.001 et seq., fraud, breach of non-disclosure obligations, and other wrongful acts.

## II.    THE PARTIES

10.    Plaintiff Crystal Lagoons U.S. Corp. is a Delaware corporation with its principal place of business at 1395 Brickell Avenue, Suite 800, Miami, Florida 33131.

11.    Plaintiff Crystal Lagoons Technologies, Inc. is a Delaware corporation with a place of business at 1395 Brickell Avenue, Suite 800, Miami, Florida 33131.

12.    Defendant Martin Aquatic Design & Engineering, LLC is a Florida limited liability company with its principal place of business at 189 S. Orange Avenue, Suite 1220, Orlando, Florida 32801.

13.    Defendant Aquatic Design & Engineering, Inc. is a Florida corporation with its principal place of business at 189 S. Orange Avenue, Suite 1220, Orlando, Florida 32801.

14.    Defendant Blue Mar Basins, LLC is a Florida limited liability company with its principal place of business at 189 S. Orange Avenue, Suite 1210, Orlando, Florida 32801.

15.    Defendant Peter Licavoli is an individual residing at 1000 West Avenue, Suite 324, Miami Beach, Florida 33139.

16.    Defendant VenuWorks, Inc. is an Iowa corporation with its principal place of business at 1615 Golden Aspen Drive, Suite 107, Ames, Iowa 50010.

17.    Defendant VenuBlue, LLC is an Iowa limited liability company with its principal place of business at 612 Kellogg Avenue, Ames, Iowa 50010.

18.     Defendant Cleartide Management Group, LLC is a Texas limited liability company that may be served with its principal place of business at 148 S. Dowlen Road, #732, Beaumont, Texas 77707.

19.     Defendant XPRNTL, LLC is a Texas limited liability company with its principal place of business at 5 W Bar-Le-Doc, Corpus Christi, Texas 78414.

20.     Defendant John Hughes is an individual residing at 5 W Bar-Le-Doc, Corpus Christi, Texas 78414.

### III.   JURISDICTION

21.     This Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1367.  The claims herein arise in part under federal law, specifically the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 et seq.

22.     This Court has supplemental jurisdiction over Crystal Lagoons' state law claims pursuant to 28 U.SC. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendants because they all reside in, do business in, and/or maintain their principal place of business in Florida.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## IV.    ALTER EGO ALLEGATIONS

**A.    <u>Hughes and XPRTNL</u>.**

25.    Crystal Lagoons is informed and believes, and on that basis alleges, that at all relevant times Hughes was the alter ego of XPRTNL.

26.    Crystal Lagoons is informed and believes, and on that basis alleges, that there is such a unity of interest and ownership between Hughes and XPRTNL that the "separate personality" of XPRTNL no longer exists.

27.    Crystal Lagoons is informed and believes, and on that basis alleges, that Hughes:

> a. Controls and dominates the business and affairs of XPRTNL;
>
> b. Commingled personal funds and assets with those of XPRTNL; and
>
> c. Disregarded legal formalities and failed to maintain an arm's length relationship with XPRTNL.

28.    At all relevant times, Hughes was responsible for and performed a majority (if not all) of XPRTNL's wrongful acts and conduct as alleged herein.

29.    Crystal Lagoons is informed and believes, and on that basis alleges, that as a result of the foregoing, XPRTNL was (and still is) the instrumentality, conduit, and alter ego of Hughes and was formed for Hughes to avoid personal liability for his wrongful conduct.  As such, Hughes is personally responsible and liable for the obligations of XPRTNL as described herein.  Unless the fiction of the

"corporate entity" is ignored, an abuse of the corporate privilege, fraud and injustice will result, all to the irreparable injury of Crystal Lagoons.

**B.     Martin Aquatic, Aquatic Design, and BMB.**

30.     Crystal Lagoons is informed and believes, and on that basis alleges, that at all relevant times Martin Aquatic, Aquatic Design, and BMB were the alter egos of each another.

31.     Crystal Lagoons is informed and believes, and on that basis alleges, that there is such a unity of interest among Martin Aquatic, Aquatic Design, and BMB that the "separate personality" of those entities no longer exists.

32.     Crystal Lagoons is informed and believes, and on that basis alleges, that Martin Aquatic, Aquatic Design, and BMB share the same (i) officers and managers, (ii) business offices (as to Martin Aquatic and Aquatic Design), (iii) employees and agents, and (iv) equipment.

33.     Crystal Lagoons is informed and believes, and on that basis alleges, that Martin Aquatic, Aquatic Design, and BMB work together on projects as a single business unit.

34.     Crystal Lagoons is informed and believes, and on that basis alleges, that Martin Aquatic (as the parent company) owns all or most of (either directly or indirectly through its owner) the corporate stock of Aquatic Design and membership units in BMB.

35.     Crystal Lagoons is informed and believes, and on that basis alleges, that Martin Aquatic finances Aquatic Design and BMB.

36.     Crystal Lagoons is informed and believes, and on that basis alleges, that Aquatic Design and BMB are inadequately capitalized.

37.     Crystal Lagoons is informed and believes, and on that basis alleges, that Martin Aquatic pays the salaries and other expenses of Aquatic Design and BMB.

38.     Crystal Lagoons is informed and believes, and on that basis alleges, that BMB and Aquatic Design operate at the direction of Martin Aquatic.

39.     Crystal Lagoons is informed and believes, and on that basis alleges, that as a result of the foregoing, Martin Aquatic, Aquatic Design, and BMB are the alter egos of each other.  As such, Aquatic Design and BMB are jointly responsible and liable for the obligations of Martin Aquatic, as set forth herein.  Unless the fiction of the "corporate entity" is ignored, an abuse of the corporate privilege, injustice will result, all to the irreparable injury of Crystal Lagoons.

## V.     AGENCY ALLEGATIONS

40.     Crystal Lagoons is informed and believes, and on that basis alleges, that Hughes was acting as the agent, employee, and/or representative of VenuWorks and VenuBlue at all relevant times until November 2021, and was acting within the course and scope of his agency and employment with the full knowledge, consent, permission, authorization, and ratification (either express or implied) of VenuWorks and VenuBlue in performing the acts (and misconduct) alleged in this Complaint.

## VI.   GENERAL ALLEGATIONS

**A.   <u>Crystal Lagoons Develops its Proprietary Lagoon Technology</u>.**

41.    Crystal Lagoons has invested significant resources—including time, money, and employee capital—to develop Crystal Lagoons' proprietary lagoon technology.  This technology includes a combination of patents, trade secrets, trademarks, trade dress, designs, and confidential information.  The architecture, design, and operation of the lagoons developed by Crystal Lagoons incorporates the full array of its intellectual property portfolio—including its trade secrets.

42.    The artificial water lagoons designed and operated by Crystal Lagoons are enormous, typically covering more than 2 acres (equivalent to more than 200 average-sized residential swimming pools) and sometimes covering up to 30 acres.  The technology necessary to design, build, and operate such water structures are different than traditional methods and technologies used to build swimming pools.  For example, traditional swimming pools often require a comprehensive concrete shell, which is unsuitable for water lagoons as concrete is susceptible to fissures, rust, cracks, leaks, and other forms of deterioration that impact structural integrity.  Moreover, traditional swimming pools often require extensive (and expensive) coatings to cover the concrete, a very large number of evenly distributed inlets and outlets, intrinsic piping networks, complex filtration systems that filter the complete water volume 4 times per day, and high doses of chlorine and other chemicals to permanently sanitize the water.

43.    Crystal Lagoons has thus spent years refining and perfecting its lagoon technology to enable the design, construction, and operation of water lagoons of any size in any place without compromising water quality and transparency—all while avoiding issues that typically plague traditional swimming pools and at lower costs. Crystal Lagoons has more than 80 projects in operation and/or construction worldwide, including projects in Texas and Florida, and more than 1,000 other projects in negotiation and planning.

**B.    Crystal Lagoons Takes Reasonable Measures to Protect its Trade Secrets.**

44.    Crystal Lagoons' continued success is based on safeguarding the intellectual property portfolio underlying its lagoon technology—including preserving the confidentiality of its trade secret information.

45.    Crystal Lagoons' trade secret information, which is not generally known or readily ascertainable, includes the following categories of information (collectively, the "***Trade Secrets***"):

a.    "**Lagoon Structure Information**" include without limitation: 1) the beach edge design, specifications, and shape, 2) manual cleaning beach chamber design and specifications, 3) wall design, specifications, and configurations,  and 4) water piping and liner installation layout, design, and specifications.

b.    "**Lagoon System Information**" include without limitation bottom cleaning system processes, designs, and specifications.

c.    "**Lagoon Engineering Design Information**" include without limitation: 1) cost and timing information, and 2) engineering drawings and schematics.

d.   **"Lagoon Development Information"** include without limitation confidential information about the 1) process and timing of planning and development of a project, and 2) technical assistance process information.

e.   **"Supplier and Vendor Information"** include without limitation, confidential information about 1) equipment suppliers, pricing (including pricing quotes), and specifications, and 2) technical vendors including engineering, architecture, construction, and similar firms.

f.   **"Customer Information"** include without limitation: 1) identity of clients, 2) pricing and royalty information, and 3) confidential terms and conditions of Crystal Lagoons' contracts with its clients.

g.   **"Client Strategic Information"** include without limitation: 1) analysis performed for client projects related to potential visitors, spreadsheets, revenue analysis and similar documents, and 2) activity information related to a lagoon project and suggestions as to how to activate the lagoon project, and PAL™ concept analysis of revenues based on tickets, visitors, and/or activation of the lagoon.

h.   **"Market Strategy Information"** includes information and analyses related to the artificial lagoon market, cost data and information, and benchmark information.

46.   The Trade Secrets are extremely valuable—and derive independent economic value to Crystal Lagoons—in part because the information allows water lagoons to be built and operated at lower costs compared to conventional swimming pool technology. For example, Crystal Lagoons' Customer Information provides a competitive advantage because, among other reasons, such information would allow competitors to direct sales efforts to reach those potential customers that are already doing business with Crystal Lagoons. For this reason, the Trade Secrets would have tremendous value to competitors (both actual and potential) of Crystal Lagoons.

47. Crystal Lagoons therefore takes reasonable steps to maintain the secrecy of its Trade Secrets and other confidential information:

a. As a condition of employment, Crystal Lagoons requires its employees (like Licavoli) to execute Employment Agreements that: (i) prohibit the "use or disclosure, during employment **and after** termination, any Confidential Information," (ii) require the employee to return all "Confidential Information" acquired during employment, (iii) assign all intellectual property developed and/or created by the employee during employment to Crystal Lagoons, and (iv) include certain non-compete provisions.

b. As a condition of sharing Trade Secrets with its partners (like VenuWorks and VenuBlue), Crystal Lagoons requires its partners to execute non-disclosure agreements ("***NDAs***") that: (i) prohibit the recipient (and its associated subsidiaries and affiliates) from disclosing Crystal Lagoons' confidential information to any third party, whether the partner is "acting by its officers, agents, employees or otherwise," (ii) prohibit the disclosure of Crystal Lagoons' confidential information to any employee of the recipient other than those who need to know the information, (iii) require the recipient to keep Crystal Lagoons' confidential information secure and confidential, and (iv) require the recipient to use Crystal Lagoons' confidential information only in connection with the project in issue. Moreover, the NDAs state that Crystal Lagoons maintains ownership of all

14

intellectual property provided to the recipient, including all improvements to such intellectual property developed by the recipient and/or its officers and employees during the project.

     c.    As a condition of issuing a license and sharing Trade Secrets with a customer for the construction of a lagoon, Crystal Lagoons requires its customers to execute Technology Licensing and Services Agreements prohibiting the disclosure of any confidential information and/or "Technology" (as defined therein) that Crystal Lagoons shares with the customer.

48.    In addition, Crystal Lagoons (i) regularly marks its documents as confidential and/or with Crystal Lagoons' logo to identify Crystal Lagoons' ownership of the information and its secret nature; (ii) implements role-based access control in its internal organization, which limits access to the information on a need-to-know basis; (iii) backs up information; (iv) uses cybersecurity measures, including firewalls and antivirus programs; (v) implements access control on its employee's computers; and (vi) provides training to employees to handle confidential information.

## C.    Hughes, VenuWorks, and VenuBlue Acquire Crystal Lagoons' Trade Secrets.

### i.    The PAL™ Business Model

49.    Crystal Lagoons has developed a business model centered around the lagoons built and operated using Crystal Lagoons' technology.  Under this model,

Crystal Lagoons generates multiple revenue streams from entrance tickets, water sports, restaurants, retail, concerts, trade shows, weddings, day clubs, and other events associated with or surrounding the water lagoon ("**PAL™ Business Model**").

50.     In connection with the PAL™ Business Model, Crystal Lagoons sought to partner and/or collaborate with companies specializing in marketing and promotion, venue management, and event programing.  VenuWorks was one such company.

**ii.      The NDA**.

51.     In early 2018, Crystal Lagoons and VenuWorks began discussing a joint collaboration related to the PAL™ Projects whereby VenuWorks would form an entity (i.e., VenuBlue) that would exclusively work with Crystal Lagoons to grow, promote, and manage certain PAL™ Projects.  In connection with these discussions, Crystal Lagoons U.S. Corp. and VenuWorks executed an NDA.

52.     The NDA, which applied not only to the contracting parties but also their "affiliates, successors, and assigns," broadly prohibited the "Recipient...whether acting by its officers, agents, employees or otherwise" from disclosing or using Crystal Lagoons' "**Confidential Information**," defined as:

> "Confidential Information" means all information...in any media including, but not limited to, all rendering, sketches, drawings, economic proposals, business model, data, know-how, formulae, processes, designs, documents, software, programs, photographs and other material related to the dealings between the parties, the business affairs or products of the Disclosing Party, its customers, clients and business associates disclosed by the Disclosing Party from time to time.  Any information created by Recipient using any

part of the Confidential Information shall also be Confidential Information. Any information related to the Technology [***defined to include trade secrets***] is also Confidential Information.

53.     Moreover, the NDA states that Crystal Lagoons maintained ownership of its intellectual property and Confidential Information, including all improvements to such by VenuWorks and/or its affiliates, officers, agents, or employees.

54.     The NDA states that the parties' confidentiality obligations "shall remain in full force and effect until information ceases to qualify as Confidential Information."

55.     At the time VenuWorks signed the NDA, and at all times while the Teaming Agreement (defined below) was operative, Hughes served as an officer, agent, and employee of VenuWorks.   Hughes' position with VenuWorks is important because the NDA prohibited VenuWorks, "whether acting by its officers, agents, employees, or otherwise," from publishing and/or disclosing the Confidential Information and restricted the use of such information to the purpose of procuring contracts for Crystal Lagoons' PAL™ business line under the Teaming Agreement.

**iii.    The Teaming Agreement**.

56.     On May 1, 2018, Crystal Lagoons U.S. Corp. and VenuWorks executed a "Teaming Agreement" to establish the terms "under which the parties will work together for the purpose of procuring contracts for the development, design, construction, operation and management of PALs[.]" VenuWorks agreed

to provide venue management, event programming, and other operational assistance for PAL™ Projects built or developed on public land owned by federal, state, or municipal governments within the United States.

57.     Section 6 of the Teaming Agreement stated that the parties would remain bound by their obligations under the NDA.

58.     On May 30, 2018, VenuWorks formed VenuBlue for the purpose of executing its obligations under the Teaming Agreement.  Crystal Lagoons, VenuWorks, VenuBlue, and Hughes operated under the Teaming Agreement and NDA for almost three years.

**iv.     Hughes, VenuWorks, and VenuBlue Acquire Crystal Lagoons' Trade Secrets**.

59.     Hughes—then VenuWork's Vice President and VenuBlue's President—was VenuWorks' primary contact in connection with the Teaming Agreement.

60.     Between May 2018 and November 2020, Crystal Lagoons worked with Hughes (on behalf of VenuWorks and VenuBlue) to procure contracts for the development of PALs.  During this period, Hughes (and/or other employees of VenuWorks and VenuBlue) attended at least 46 meetings and/or site visits with current and prospective clients, including, but not limited to:

        a.     Meetings with current and prospective customers of Crystal Lagoons and/or employees of Crystal Lagoons on July 10, 2018, July 17, 2018, July 24, 2018, July 31, 2018, August 7, 2018, April 4, 2019,  April 17,

2019, April 30, 2019, May 10, 2019, May 15, 2019, May 21, 2019, June 6, 2019, June 26, 2019, July 8, 2019, July 12, 2019, July 19, 2019, July 26, 2019, August 2, 2019, August 5, 2019, August 13, 2019, September 27, 2019, October 1, 2019, November 14, 2019, November 20, 2019,  January 6, 2020, January 11, 2020, January 17, 2020, January 21, 2020, February 7, 2020, May 21, 2020, May 27, 2020,  July 20, 2020, July 30, 2020, August 7, 2020, and October 14, 2020.

   b. Site visits to Crystal Lagoons' projects, including: (i) visits at Lago Mar in October 2018 and on January 10, 2022 and January 11, 2020; (ii) visits at Windsong on November 29, 2018, June 6, 2019, and June 28, 2019; (iii) visits at Epperson on April 19, 2018, March 12, 2020, and August 6, 2020; and (iv) visits at Balmoral on January 29, 2019, February 4, 2019

61. Crystal Lagoons also introduced Hughes, VenuBlue, and VenuWorks to at least 17 of its clients in the United States to promote the PAL™ Business Model.

62. Before, during, and after those meetings and site visits, Crystal Lagoons shared its Trade Secrets with Hughes, VenuWorks, and VenuBlue—both in person and in email correspondence with Hughes and/or other employees of VenuWorks and VenuBlue.  Such information included:

   a. Lagoon Structure Information, including the (i) beach edge design, specifications, and shape, (ii) manual cleaning beach chamber design and specifications, (iii) wall design, specifications, and

configurations, and (iv) water piping and liner installation layout, design, and specifications.

b.      Lagoon System Information, including the bottom cleaning system processes, designs, and specifications.

c.      Lagoon Engineering Design Information, including (i) timing information, and (ii) engineering drawings and schematics.

d.      Machine Room Information, including machine room plans, layouts, and specifications.

e.      Lagoon Development Information, including (i) process and timing of planning and development of the Emerald Lakes project and the Sapphire Bay project, and (ii) technical assistance process information, including for the Emerald Lakes project.

f.      Supplier and Vendor Information, including (i) equipment supplier, pricing, and specifications, and (ii) technical vendors, including engineering firm.

g.      Customer Information, including (i) pricing information, and (ii) confidential terms and conditions of Crystal Lagoons' contracts with its clients.

h.      Client Strategic Information, including (i) analysis performed for client projects related to potential visitors, spreadsheets, revenue analysis, and similar documents, and (ii) activity information related to a lagoon project and suggestions as to how to activate the lagoon project,

PAL™ concept analysis of revenues based on tickets, visitors, and/or activation of the lagoon.

i.    Market Strategy Information, including cost data and benchmark information.

63.   Under the NDA, VenuWorks (including its officers, like Hughes, and its affiliates, like VenuBlue) was under an obligation to maintain the secrecy of this information.

**v.    Hughes, VenuWorks, and VenuBlue Misrepresent Material Facts to Crystal Lagoons.**

64.   On September 24, 2019, Hughes, on behalf of VenuWorks and VenuBlue, sent an email to Fernando Fischmann, the founder of Crystal Lagoons, promising that: (i) "VenuBlue will not enter into operation agreements with other facilities that involve lined bodies over 3000m in size of crystal clear water with beaches used for bathing;" (ii) VenuBlue would respect Crystal Lagoons' "confidentiality and IP rights;" and (iii) VenuBlue would continue to be a great partner to Crystal Lagoons.

65.   These representations were false—neither Hughes, nor VenuWorks, nor VenuBlue intended to "respect" Crystal Lagoons' "confidentiality and IP rights" or refrain from entering into operation agreements with other water facilities for certain types and sizes of water bodies.

### vi.   The Parties Terminate the Teaming Agreement; Hughes Forms XPRNTL.

66.   On or around November 5, 2020, Crystal Lagoons and VenuWorks mutually terminated the Teaming Agreement.   By that time, VenuBlue was managing and/or collaborating with the projects at Sapphire Bay, Emerald Lakes, and Lago Mar.

67.   In connection with the termination of the Teaming Agreement, Cleartide was formed to pick up where VenuBlue left off and undertook to manage Sapphire Bay. Hughes describes himself as the founder and former President of Cleartide.

68.   On or about November 3, 2021, Hughes left Cleartide to form XPRNTL, another venue management company established "for consulting and management of lifestyle destination venues anchoring large-scale, mixed-used development projects."

### D.   <u>Licavoli Acquires Crystal Lagoons' Trade Secrets</u>.

69.   In June 2019 Licavoli joined Plaintiff Crystal Lagoons U.S. Corp. as the Regional Director (East U.S.).   As a condition of his employment, Licavoli executed an Employment Agreement with the same type of confidentiality terms identified above in paragraph 47(a).   Licavoli thus owed (and continues to owe) a contractual duty to Crystal Lagoons to not disclose the confidential information acquired by him during his employment with Crystal Lagoons.

70.    In his position as Regional Director, Licavoli enjoyed access to key facets of Crystal Lagoons' business operations and, on information and belief, acquired Crystal Lagoons' Trade Secrets, including, but not limited to:

- Market Strategy Information, including information and analyses related to the artificial lagoon market, cost data and information, and benchmark information;

- Customer Information, including identity of clients, pricing information, and confidential terms and conditions of Crystal Lagoons' contracts with its clients;

- Client Strategic Information, including (i) analysis performed for client projects related to potential visitors, spreadsheets, revenue analysis, and similar documents, (ii) activity information related to a lagoon project and suggestions as to how to activate the lagoon project, and (iii) PAL™ concept analysis of revenues based on tickets, visitors, and/or activation of the lagoon.

71.    During his time at Crystal Lagoons, Licavoli worked closely with Hughes, VenuWorks, and VenuBlue to grow the PAL™ Business Model. Licavoli introduced Hughes, VenuWorks, and VenuBlue to many actual and potential customers of Crystal Lagoons.

72.    In July 2020, Licavoli left Crystal Lagoons.

**E.      Martin Aquatic Launches BMB Using the Trade Secrets Misappropriated from Crystal Lagoons.**

73.      Formed in 1987, Martin Aquatic has historically built and operated water facilities using traditional swimming pool technology, which (as noted above) is vastly different than the technology needed to design, build, and operate multi-acre, artificial water lagoons.

74.      In April 2021, Martin Aquatic formed BMB to expand its business line to artificial water lagoons.[4] But to commercialize the new product and help close deals with customers, Martin Aquatic and BMB needed people with experience in this niche field.  Hughes and Licavoli were those people.

**i.      Martin Aquatic and BMB Acquire the Trade Secrets Through Hughes, Cleartide, and XPRNTL.**

75.      On information and belief, Hughes enjoys a close relationship with the founder of Martin Aquatic.  Martin Aquatic knew that Hughes had worked with Crystal Lagoons on the PAL™ model and therefore strategically engaged Cleartide and/or XPRNTL so that Hughes could assist with the forthcoming launch of BMB.

76.      In connection with this collaboration, Crystal Lagoons believes that Hughes disclosed the Trade Secrets to Martin Aquatic and BMB while Hughes was President of Cleartide, and that such disclosure continued after Hughes left

---

[4] BMB advertises on its website that "Blue Mar Basins™ by Martin Aquatic are large-scale, man-made swimming amenities backed by patent-pending technology.  These custom-designed bodies of water allow developers to build pools of any size—with no bathing load limits, no minimum size restrictions, and no constant manual maintenance required." *See* https://bluemarbasins.com.

Cleartide to form XPRNTL. Crystal Lagoons believes this disclosure occurred despite their knowledge that this highly confidential information should not be disclosed by virtue of Hughes' knowledge of the NDA.

77.     On information and belief, Martin Aquatic and BMB acquired the Trade Secrets through Hughes, Cleartide and XPRNTL knowing (or with reason to know) that such information was acquired in breach of the NDA.  Given that (i) NDAs are commonplace in tech-oriented industries, (ii) Hughes and the founder of Martin Aquatic maintain a close relationship, and (iii) Crystal Lagoons regularly marks its documents as confidential and/or with Crystal Lagoons' logo to identify Crystal Lagoons' ownership of the information and its secret nature, Martin Aquatic and BMB knew (or had reason to know) the information was subject to a non-disclosure obligation, and that Hughes disclosure of such information amounted to a breach of a duty to maintain the secrecy of such information.

### ii.     Martin Aquatic and BMB Acquire the Trade Secrets Through Licavoli.

78.     On information and belief, Hughes introduced Martin Aquatics to Licavoli, with whom Hughes had worked with in connection with the PAL™ model.  Licavoli, who left Crystal Lagoons in July 2020, had acquired the Trade Secrets subject to the non-disclosure provision in his Employment Agreement.

79. Given Licavoli's prior position at Crystal Lagoons, Martin Aquatic and BMB knew he had knowledge of the Trade Secrets, and intended to exploit that information to enter the lagoon market.

80. Martin Aquatic and BMB thus solicited Licavoli to join their ranks. Moreover before hiring Licavoli, Martin Aquatic knew that he had held director-level position with Crystal Lagoons and, as such, knew or should have known during any routine background investigation that Licavoli had executed an Employment Agreement with Crystal Lagoons with a non-disclosure provision.

81. In February 2022, Martin Aquatic hired Licavoli as a Business Development Director where he, among other things, developed "strategic partnerships with Martin Aquatic's new and existing clients in the residential, commercial, retail, and hospitality markets." Licavoli held a similar position and duties at Martin Aquatic as he previously held at Crystal Lagoons.

82. On information and belief, Licavoli took the Trade Secrets with him to Martin Aquatic to help launch and promote BMB. Crystal Lagoons believes that this information enabled Martin Aquatic to accelerate the development and commercialization of its lagoon product and helped close deals with customers.

83. Crystal Lagoons believes Martin Aquatic and BMB acquired the Trade Secrets through Licavoli knowing (or with reason to know) that such information was acquired in breach of his non-disclosure obligations to Crystal Lagoons. Given that (i) non-disclosure agreements with employees (that survive the employee's termination) are commonplace in tech-oriented industries, (ii)

Martin Aquatic knew that he had held director-level position with Crystal Lagoons where he likely enjoyed access to sensitive confidential information, (iii) Licavoli held a similar position and duties at Martin Aquatic as he previously held at Crystal Lagoons, thus increasing the risk of disclosure of the Trade Secrets, and (iv) Crystal Lagoons regularly marks its documents as confidential and/or with Crystal Lagoons' logo to identify Crystal Lagoons' ownership of the information and its secret nature, Martin Aquatic and BMB knew (or had reason to know) the information was subject to a non-disclosure obligation, and that Licavoli's disclosure of such information amounted to a breach of a duty to maintain the secrecy of such information.

### iii.   Martin Aquatic Uses the Trade Secrets to Launch BMB.

84.    In June 2022, Martin Aquatic launched BMB as a new business line to develop and operate multi-acre, artificial swimming facilities:

> The crucial element of any Blue Mar Basins system is the way it is engineered, which is the main reason that our clients rely on Martin Aquatic's expertise. We have developed this patent-pending technology to be more sustainable than traditionally-designed swimming pools, while maintaining a higher quality of water than other systems currently available on the market. Using Blue Mar Basins technology, these swimming amenities will experience greater water savings, chemical savings, and energy savings through a proprietary process for filtration, automation, and water distribution.[5]

85.    Martin Aquatic has launched BMB to build "large-scale, man-made swimming amenities" (like Crystal Lagoons) with "beach-style zero entry" (like

---

[5] https://martinaquatic.com/market-sectors/blue-mar-basins/.

Crystal Lagoons) along with aquatic design services (like Crystal Lagoons), engineering services (like Crystal Lagoons), bid services (like Crystal Lagoons), and construction administration support (like Crystal Lagoons). Indeed, Martin Aquatic's own patent filing confirms the substantial similarities between the water lagoon technologies offered by Martin Aquatic and Crystal Lagoons—the international search report[6] related to Martin Aquatic's international patent application (PCT Application) cites two of Crystal Lagoons' patents as a potential bar to granting the patent, indicating Crystal Lagoons' patents affect the novelty and inventive step of Martin Aquatic's sole alleged invention set forth in its patent application.

86.     Martin Aquatic thus used the Trade Secrets to launch BMB to avoid the immense time and expense necessary to independently develop their own lagoon technology. Unlike Crystal Lagoons' technology, which took years and tens of millions of dollars to develop and refine, Martin Aquatic developed its business plan and technology related to artificial lagoons in approximately 14 months. It is inconceivable that Martin Aquatic and BMB could have independently developed such complex lagoon technology in such a short period of time—particularly when Martin Aquatic had not offered such products/services in its decades of existence.

---

[6] The search report was issued by the World Intellectual Property Office.

**F.**   **Martin Aquatic and BMB Solicit Crystal Lagoons' Clients.**

87.   On information and belief, Martin Aquatic and BMB have improperly solicited clients under contract with Crystal Lagoons, encouraging them to terminate (and breach) their contracts with Crystal Lagoons.  On information and belief, Martin Aquatics and BMB misappropriated Crystal Lagoons' Customer Information (its pricing and royalty structure) to market alternative pricing arrangements to these clients to undercut Crystal Lagoons' business relationships.

88.   One of Crystal Lagoons' clients has recently indicated its intent to improperly terminate multiple agreements with Crystal Lagoons.  On information and belief, this client is exploring termination of these contracts to partner with Martin Aquatic and BMB—a direct result of Martin Aquatic's and BMB's improper solicitations.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Misappropriation Of Trade Secrets in Violation**
**of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.**
**(Plaintiffs Against Martin Aquatic, Aquatic Design, BMB, Licavoli,**
**Hughes, Cleartide, and XPRNTL)**

89.   As set forth above in Section VI(B), Crystal Lagoons owns trade secret information that enjoys protection under the Defend Trade Secrets Act.

90.   As set forth above in Section VI(B), Crystal Lagoons enjoys a competitive advantage because of its Trade Secrets, whether such information is tangible or intangible, and whether (or however) the information is stored,

compiled, or memorialized physically, electronically, graphically, and/or photographically.

91.  As set forth above in Section VI(B), Crystal Lagoons has taken reasonable and adequate measures to maintain the secrecy of its Trade Secrets.

92.  As set forth above in Section VI(B), Crystal Lagoons' Trade Secrets are valuable and derive independent economic value because they are not generally known or readily accessible through proper means to others.  The information is valuable in part because it allows water lagoons to be built and maintained at lower costs compared to conventional swimming pool technology. The information in part enables the design, construction, and operation of water lagoons of any size in any place for recreational purposes without sacrificing water quality and sanitary conditions—all while avoiding issues that typically plague traditional swimming pools, as discussed above in Section VI(A).

93.  Crystal Lagoons has invested significant time, human capital, and tens of millions of dollars to develop its lagoon technology, forged (in part) by the Trade Secrets.  Competitors of Crystal Lagoons, like Martin Aquatic and BMB, could gain an unfair competitive edge and profit from the use of Crystal Lagoons' Trade Secrets by undercutting its prices.

94.  Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

95.  As set forth above in Sections VI(B), VI(C)(ii), and VI(D), Licavoli and Hughes were (and continue to be) under a duty to both (i) keep Crystal

Lagoons' Trade Secrets and Confidential Information secret, and (ii) not use or disclose such information other than for the benefit of Crystal Lagoons.

96. As set forth above in Sections VI(C)(iv), VI(D), and VI(E), Licavoli, Hughes, Cleartide, and XPRNTL misappropriated Crystal Lagoons' Trade Secrets by disclosing such information to Martin Aquatic and BMB when they knew, or had reason to know, that the information was subject to the confidentiality and use restrictions in (i) the Employment Agreement, as to Licavoli, and (ii) the NDAs, as to Hughes, Cleartide, and XPRNTL.

97. As set forth above in Section VI(E), Martin Aquatic and BMB misappropriated Crystal Lagoons' Trade Secrets by acquiring and/or using such information with knowledge that Licavoli and Hughes (and by extension, Cleartide and XPRNTL) were under a duty to maintain the secrecy of such information.

98. The foregoing conduct constitutes an actual and threatened misappropriation and misuse of Crystal Lagoons' Trade Secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

99. The actions alleged above were a deliberate scheme and plan to deprive Crystal Lagoons of the benefits of its own substantial investments in its lagoon technology, and to steal the economic benefit of its know-how and labor.

100. As a direct and proximate cause of the foregoing actions, Crystal Lagoons has suffered, and will continue to suffer, actual damages, including loss

of capital, loss of valuable business, loss of profits and loss of future profits, and loss of goodwill, in an amount to be proven at trial.

101.   As a further proximate result of the foregoing misappropriation, Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB have been unjustly enriched in an amount that cannot presently be ascertained.

102.   Crystal Lagoons has suffered and will continue to suffer irreparable harm because of the foregoing activities that cannot be adequately remedied at law unless Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB, including their agents and all other persons acting in concert with them, are enjoined from engaging in such further acts.

103.   Crystal Lagoons is informed and believes, and on that basis alleges, that the conduct of Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB was and is malicious, fraudulent, deliberate, and/or willful, as demonstrated by their conduct described above.  Crystal Lagoons is therefore entitled to recover from Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB, exemplary damages as permitted by 18 U.S.C. § 1836(b)(3)(C).

104.   Crystal Lagoons is also entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

105.   As set forth above in Section IV(B), Aquatic Design is, on information and belief, the alter ego of Martin Aquatic and BMB.  As such, Aquatic Design is liable for the foregoing violations of the Defend Trade Secrets Act by Martin Aquatic and BMB.

### SECOND CAUSE OF ACTION
**Misappropriation Of Trade Secrets in Violation
Of Florida's Uniform Trade Secret Act, § 688 *et seq*., Fla. Stat. (2010)
(Plaintiffs Against Martin Aquatic, Aquatic Design, BMB, Licavoli,
Hughes, Cleartide, and XPRNTL)**

106.   As set forth above in Section VI(B), Crystal Lagoons owns trade secret information that enjoys protection under the Florida Uniform Trade Secret Act.

107.   As set forth above in Section VI(B), Crystal Lagoons enjoys a competitive advantage because of its Trade Secrets, whether such information is tangible or intangible, and whether (or however) the information is stored, compiled, or memorialized physically, electronically, graphically, and/or photographically.

108.   As set forth above in Section VI(B), Crystal Lagoons has taken reasonable and adequate measures to maintain the secrecy of its Trade Secrets.

109.   As set forth above in Section VI(B), Crystal Lagoons' Trade Secrets are valuable and derive independent economic value because they are not generally known or readily accessible through proper means to others.  The information in part enables the design, construction, and operation of water lagoons of any size in any place without sacrificing water quality and transparency—all while avoiding issues that typically plague traditional swimming pools, as discussed above in Section VI(A).

110.   Crystal Lagoons has invested significant time, human capital, and tens of millions of dollars to develop its lagoon technology, forged (in part) by the Trade Secrets.  Competitors of Crystal Lagoons, like Martin Aquatic and BMB,

could gain an unfair competitive edge and profit from the use of Crystal Lagoons' Trade Secrets by undercutting its prices.

111.   Accordingly, the above-described information constitutes "trade secrets" under the Florida Uniform Trade Secret Act, § 688.002(4), Fla. Stat. (2010).

112.   As set forth above in Sections VI(B), VI(C)(ii), and VI(D), Licavoli and Hughes were (and continue to be) under a duty to both (i) keep Crystal Lagoons' Trade Secrets and Confidential Information secret, and (ii) not use or disclose such information other than for the benefit of Crystal Lagoons.

113.   As set forth above in Sections VI(C)(iv), VI(D), and VI(E), Licavoli, Hughes, Cleartide and XPRNTL misappropriated Crystal Lagoons' Trade Secrets by disclosing such information when they knew, or had reason to know, that the information was subject to the confidentiality and use restrictions in (i) the Employment Agreement, as to Licavoli, and (ii) the NDAs, as to Hughes, Cleartide, and XPRNTL.

114.   As set forth above in Section VI(E), Martin Aquatic and BMB misappropriated Crystal Lagoons' Trade Secrets by acquiring and/or using such information with knowledge that Licavoli and Hughes (and by extension, Cleartide and XPRNTL) were under a duty to maintain the secrecy of such information.

115.   The foregoing conduct constitutes an actual and threatened misappropriation and misuse of Crystal Lagoons' trade secret information in violation of the Florida Uniform Trade Secrets Act.

116.   The foregoing acts were a deliberate scheme and plan to deprive Crystal Lagoons of the benefits of its own substantial investments in its lagoon technology, and to steal the economic benefit of its know-how and labor.

117.   As a direct and proximate cause of the foregoing actions, Crystal Lagoons has suffered, and will continue to suffer, actual damages, including loss of capital, loss of valuable business, loss of profits and loss of future profits, and loss of goodwill, in an amount to be proven at trial.

118.   As a further proximate result of the foregoing misappropriation, Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB have been unjustly enriched in an amount that cannot presently be ascertained.

119.   Crystal Lagoons has suffered and will continue to suffer irreparable harm because of the foregoing activities that cannot be adequately remedied at law unless Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB, including their agents and all other persons acting in concert with them, are enjoined from engaging in such further acts.

120.   Crystal Lagoons is informed and believes, and on that basis alleges, that the conduct of Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB was and is malicious, fraudulent, deliberate, and/or willful.   They intentionally and/or recklessly engaged in a course of conduct designed to damage

Crystal Lagoons—in knowing violation of the rights of Crystal Lagoons.  Crystal Lagoons is therefore entitled to recover from Licavoli, Hughes, Cleartide, XPRNTL, Martin Aquatic, and BMB, exemplary damages as permitted by § 688.004(2), Fla. Stat. (2010).

121.    Crystal Lagoons is also entitled to an award of attorneys' fees pursuant to § 688.005, Fla. Stat. (2010).

122.    As set forth above in Section IV(B), Aquatic Design is, on information and belief, the alter ego of Martin Aquatic and BMB.  As such, Aquatic Design is liable for the foregoing violations of Florida's Uniform Trade Secret Act by Martin Aquatic and BMB.

**THIRD CAUSE OF ACTION**
**Breach of Contract**
**(Plaintiff Crystal Lagoons U.S. Corp. against**
**VenuWorks and Licavoli)**

123.    Crystal Lagoons U.S. Corp. and Licavoli executed the Employment Agreement.  This is a valid and enforceable contract between Crystal Lagoons U.S. Corp. and Licavoli.

124.    Crystal Lagoons U.S. Corp. and VenuWorks executed an NDA and Teaming Agreement.  A true and correct copy of the NDA is attached as **Exhibit A**.  The NDA and Teaming Agreement are valid and enforceable contracts between Crystal Lagoons U.S. Corp. and VenuWorks.

125.    Based on the unambiguous terms of the Employment Agreement, Licavoli agreed not to publish and/or disclose Crystal Lagoons' Confidential

Information (defined therein to include the Trade Secrets) without the consent of Crystal Lagoons U.S. Corp.

126.   Moreover, the unambiguous terms of the NDA required VenuWorks, "whether acting by its officers, agents, employees, or otherwise," from publishing and/or disclosing Crystal Lagoons' Confidential Information (defined to include the Trade Secrets) and restricted the use of such information for the purpose of procuring contracts for the PAL™ Business Model under the Teaming Agreement. Furthermore, the Teaming Agreement incorporated by reference VenuWorks' confidentiality obligations in the NDA.

127.   Crystal Lagoons U.S. Corp. has performed all of its covenants and/or conditions under the Employment Agreement, NDA, and Teaming Agreement—except to the extent that such performance has been prevented, excused, hindered, or waived by Licavoli and VenuWorks.

128.   As set forth above in Sections VI(D) and VI(E)(ii), Licavoli breached the Employment Agreement by taking, disclosing, transferring, removing, misusing, and/or misappropriating Crystal Lagoons' Confidential Information.

129.   As set forth above in Sections VI(C) and VI(E)(i), VenuWorks breached the NDA and Teaming Agreement because its officer (Hughes) took, disclosed, transferred, removed, misused, and/or misappropriated Crystal Lagoons' Confidential Information.

130.    As a direct and proximate result of the foregoing material breaches of contract, Crystal Lagoons U.S. Corp. has sustained general, special, consequential, and incidental damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Plaintiff Crystal Lagoons U.S. Corp. Against Licavoli and**
**VenuWorks)**

131.    As set forth above in Sections VI(B) and VI(D), Crystal Lagoons U.S. Corp. and Licavoli entered into the Employment Agreement.  Pursuant to the Employment Agreement, Licavoli owed an obligation to keep secret all of Crystal Lagoons' Confidential Information and Trade Secrets that he acquired during his employment.

132.    As set forth above in Sections VI(C)(ii) and VI(C)(iii), Crystal Lagoons U.S. Corp. and VenuWorks entered into the NDA and Teaming Agreement.  A true and correct copy of the NDA is attached as **Exhibit A**. Pursuant to the NDA and Teaming Agreement, VenuWorks (on behalf of itself and its officers, directors, and agents) owed an obligation to Crystal Lagoons U.S. Corp. to keep secret all of Crystal Lagoons' Confidential Information and Trade Secrets that it acquired from Crystal Lagoons.

133.    As with every contract, the Employment Agreement, NDA, and Teaming Agreement contained an implied covenant of good faith and fair dealing that required Licavoli and VenuWorks to refrain from doing anything that would

injure Crystal Lagoons U.S. Corp.'s right to receive the benefits of the confidentiality provisions in those agreements.

134.   Crystal Lagoons U.S. Corp. has performed all of the covenants and conditions of the Employment Agreement, NDA, and Teaming Agreement to be performed on its part, except to the extent that such performance has been prevented, excused, hindered, or waived by Licavoli and VenuWorks.

135.   All conditions required for Licavoli's and VenuWorks' performance had occurred.

136.   As set forth above in Sections VI(C)(iv), VI(D), and VI(E), Licavoli and VenuWorks breached their contractual obligations under those agreements. Licavoli and VenuWorks engaged in bad faith conduct that prevented Crystal Lagoons U.S. Corp. from receiving the benefits under the Employment Agreement, NDA, and Teaming Agreement—namely maintaining the secrecy of its Confidential Information and Trade Secrets.  Licavoli and VenuWorks thus failed to act fairly and in good faith in performing their contractual duties under the Employment Agreement, NDA, and Teaming Agreement.

137.   As a direct and proximate result of the conduct described hereinabove, Crystal Lagoons U.S. Corp. has sustained general, special, consequential, and incidental damages in an amount to be determined according to proof at trial.

## FIFTH CAUSE OF ACTION
### Fraudulent Misrepresentation
### (Plaintiffs Against Hughes, VenuWorks, and VenuBlue)

138.   As set forth above in Section VI(C)(v), on or around September 24, 2019, Hughes (in his capacity as Vice President of VenuWorks and President of VenuBlue) sent an email to Crystal Lagoons, promising that: (i) "VenuBlue will not enter into operation agreements with other facilities that involve lined bodies over 3000m in size of crystal clear water with beaches used for bathing;" (ii) VenuWorks would respect Crystal Lagoons' "confidentiality and IP rights;" and (iii) VenuWorks would continue to be a great partner to Crystal Lagoons.

139.   As set forth above in Sections VI(C)(v) and VI(E), these representations of material fact were false.  Hughes never intended to "respect" Crystal Lagoons' "confidentiality and IP rights," shown by his later misappropriation of Crystal Lagoons' Trade Secrets.  And, on information and belief, VenuWorks (through its affiliate, VenuBlue) never intended to honor the representation that it would not enter into other operation agreements, as VenuWorks (through its affiliate, VenuBlue) did enter into operation agreements with lagoons at Sapphire Bay in Dallas, Texas, Emerald Lakes in Palm Bay, Florida, and Lago Mar in Houston, Texas.

140.  On information and belief, Hughes (individually and in his representative capacities described above) knew that the above material representations were false when made.

141.    On information and belief, Hughes made these material misrepresentations with the intent to induce Crystal Lagoons to take actions detrimental to its interests—i.e., to continue providing Hughes, VenuWorks, and VenuBlue with its Trade Secrets and Confidential Information.

142.    Crystal Lagoons did rely on these misrepresentations in continuing to work with Hughes, VenuWorks, and VenuBlue in connection with the PAL™ Business Model.

143.    Crystal Lagoons was ignorant of the true facts when Hughes made the foregoing material misrepresentations.

144.    As a direct and proximate result of these misrepresentations, Crystal Lagoons has suffered damages to be determined according to proof at trial.

145.    Crystal Lagoons is informed and believes, and on that basis alleges, that Hughes, VenuWorks, and VenuBlue acted with intentional misconduct and/or gross negligence, as those terms are defined in § 768.72(2)(a)-(b), Fla. Stat. (2022), such that Crystal Lagoons is entitled to recover punitive damages in an amount to be determined according to proof at trial.

**SIXTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Plaintiffs Against Hughes, VenuWorks, and VenuBlue)**

146.    As set forth above in Section VI(C)(v), on or around September 24, 2019, Hughes (in his capacity as Vice President of VenuWorks and President of VenuBlue) sent an email to Crystal Lagoons, promising that: (i) "VenuBlue will not enter into operation agreements with other facilities that involve lined bodies

over 3000m in size of crystal clear water with beaches used for bathing;" (ii) VenuWorks would respect Crystal Lagoons' "confidentiality and IP rights;" and (iii) VenuWorks would continue to be a great partner to Crystal Lagoons.

147. As set forth above in Sections VI(C)(v) and VI(E), these representations of material fact were false. Hughes never intended to "respect" Crystal Lagoons' "confidentiality and IP rights," shown by his later misappropriation of Crystal Lagoons' Trade Secrets. And, on information and belief, VenuWorks (through its affiliate, VenuBlue) never intended to honor the representation that it would not enter into other operation agreements, as VenuWorks (through its affiliate, VenuBlue) did enter into operation agreements with lagoons at Sapphire Bay in Dallas, Texas, Emerald Lakes in Palm Bay, Florida, and Lago Mar in Houston, Texas.

148. On information and belief, Hughes (individually and in his representative capacities described above) knew that the above material representations were false when made or, at minimum, were made recklessly and without regard to their truth or falsity.

149. On information and belief, Hughes made these material misrepresentations with the intent to induce Crystal Lagoons to take actions detrimental to its interests—i.e., to continue providing Hughes, VenuWorks, and VenuBlue with its Trade Secrets and Confidential Information.

150. Crystal Lagoons was ignorant of the true facts when Hughes made the foregoing material misrepresentations.

151.    Crystal Lagoons reasonably relied on Hughes misrepresentations to its detriment by continuing to work with Hughes, VenuWorks, and VenuBlue in connection with the PAL™ Business Model.

152.    As a direct and proximate result of these misrepresentations, Crystal Lagoons has suffered damages to be determined according to proof at trial.

153.    Crystal Lagoons is informed and believes, and on that basis alleges, that Hughes, VenuWorks, and VenuBlue acted with intentional misconduct and/or gross negligence, as those terms are defined in § 768.72(2)(a)-(b), Fla. Stat. (2022), such that Crystal Lagoons is entitled to recover punitive damages in an amount to be determined according to proof at trial.

**SEVENTH CAUSE OF ACTION**
**Tortious Interference with Business Relations**
**(Plaintiffs Against Martin Aquatic and BMB)**

154.    Crystal Lagoons has established contractual and economic business relationships with its customers.  Crystal Lagoons has the right to reap the profits resulting from these established business relationships.

155.    Martin Aquatic and BMB knew, or should have known, about Crystal Lagoons' business relationships with its customers.

156.    As set forth in Section VI(F), Martin Aquatic and BMB attempted to disrupt, with intent, the relationship between Crystal Lagoons and its customers by marketing alternative pricing arrangements to these clients to undercut Crystal Lagoons' business relationships.

157.    Martin Aquatic and BMB have disrupted Crystal Lagoons business relationships with one or more of its customers, including at least one customer who indicated its intention to terminate at least four project with Crystal Lagoons that would otherwise have yielded substantial profits for Crystal Lagoons.

158.    Crystal Lagoons is informed and believes, and on that basis alleges, that by engaging in this conduct Martin Aquatic and BMB intended to disrupt the relationship between Crystal Lagoons and its customers or knew that such disruption was certain or substantially likely to occur.

159.    As a direct and proximate cause of Martin Aquatic and BMB's actions, Crystal Lagoons has suffered, and will continue to suffer, actual damages as a result of such disruption in an amount to be determined at trial.

160.    Crystal Lagoons is informed and believes, and on that basis alleges, that Martin Aquatic and BMB acted with oppression, fraud, and malice, and with the intent to injure and damage Crystal Lagoons, entitling Crystal Lagoons to an award of punitive damages against Martin Aquatic and BMB in an amount according to proof at trial and sufficient to punish and to deter them from engaging in this conduct in the future.

## VIII.  <u>DEMAND FOR RELIEF</u>

**WHEREFORE**, Plaintiffs Crystal Lagoons U.S. Corp. and Crystal Lagoons Technologies, Inc. ask this Court to enter judgment against the Defendants as follows:

1.    For compensatory damages in an amount to be determined at trial

together with interest thereon at the legal rate;

2.    For punitive and exemplary damage in an amount appropriate to punish or set an example of Defendants;

3.    For disgorgement of all monies unjustly received by Defendants and retained at the expense of Crystal Lagoons;

4.    For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

5.    For preliminary and permanent injunctive relief ordering Defendants to refrain from using or disclosing all trade secrets of Crystal Lagoons in their possession, custody, or control;

6.    For preliminary and permanent injunctive relief ordering Defendants to refrain from further violations of the Florida Deceptive Trade Practices Act;

7.    For preliminary and permanent injunctive relief prohibiting any further wrongful possession, disclosure, and/or misuse of Crystal Lagoons' Trade Secrets and Confidential Information, and preventing Defendants from profiting or benefiting from their wrongful conduct;

8.    Ordering Defendants return to Crystal Lagoons (and purge from their possession, custody, and control), any and all documents, information, and computer-based files or data (however maintained, in whatever form, whether originals or copies), that Defendants acquired from Crystal Lagoons;

9.    For Crystal Lagoons' attorneys' fees and costs, both trial and appellate;

10.  For prejudgment and post judgment interest at the maximum legal rate, as provided by the laws of the state of Florida, as applicable; and

11.  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

WHEREFORE, the Plaintiff requests a trial by jury on all issues so triable.

Date: August 24, 2023                    Respectfully submitted,


/s/ William C. Matthews

**Dennison & Matthews, PLLC**
7575 Dr. Phillips Blvd., Ste. 170
Orlando, FL 32819
(407) 720-8074 (w)
(407) 720-8037 (f)
William C. Matthews, Esq.
Florida Bar No. 112079
william@dennisonmatthews.com


**THOMPSON COBURN LLP**
10100 Santa Monica Blvd, Suite 500
Los Angeles, California 90067
Tel: (310) 282-2500
Fax: (310) 282-2501

Yael Tobi, Esq. (*Pro Hac Vice forthcoming*)
ytobi@thompsoncoburn.com
California Bar No. 231425
Andrew J. McKeon, Esq. (*Pro Hac Vice forthcoming*)
amckeon@thompsoncoburn.com
Texas Bar No. 24092810

*Counsel for Plaintiffs Crystal Lagoons US Corp and Crystal Lagoons Technologies Inc.*